NATHANIEL A. WEISBROT (NW6029)
*LAW OFFICE OF N. ARI WEISBROT LLC*
1099 Allessandrini Avenue
New Milford, New Jersey 07646
(201) 788.6146
aweisbrot@weisbrotlaw.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOME REVOLUTION, LLC, EVAN SOHN, and JAY GOLDBERG, <br><br><br> Plaintiffs <br><br> vs. <br><br> JERRICK MEDIA HOLDINGS, INC., a/k/a and JEREMY FROMMER, <br><br> Defendants. | CIVIL ACTION NO: 2:20−CV−07775(JMV)(MF) <br><br><br> Civil Action <br><br><br> **AMENDED COMPLAINT** |

Plaintiffs Home Revolution, LLC, Evan Sohn, and Jay Goldberg (hereinafter, collectively, "Plaintiffs"), by way of Amended Complaint against Defendants Jerrick Media Holdings, Inc. and Jeremy Frommer (hereinafter, collectively, "Defendants") allege and say as follows:

### NATURE OF ACTION

1.      Plaintiffs bring this Action to force the Defendants to comply with their written agreements and to recover their significant damages incurred as a result of the Defendants' complicated and extensive scheme through which they acquired a valuable business from the Plaintiffs but then refused to pay for it, refused to register the Plaintiffs' contractual stock, and then proceeded to destroy the value of the business through a series of improper actions that

violated the parties 'written agreements.

2.      The fundamental theory in this case is that the Defendants carefully crafted a fraudulent scheme to obtain a desperately needed asset in order to convince the Plaintiffs, the public, shareholders, and the relevant stock exchanges, that Jerrick is sustainable. They never planned on paying Plaintiffs for the asset, they never planned on registering the Plaintiffs' shares, and they deceptively (but unlawfully) fully integrated Seller's Choice into Jerrick in order to conceal the chicanery (after all, if the public learned that the sudden "bump" in revenue came from an acquisition (that was not paid for) and not from anything Jerrick was doing, they would never get up-listed, and never get investors.  Sellers' Choice represented more than 90% of Jerrick's 2019 revenue. The Defendants simply used this transaction to defraud the Plaintiffs. As set forth below, there is ample evidence of these claims but none as compelling as Defendant Frommer's own words. Not just what he DID say, but what he did not say. He manipulated the shares of Jerrick through a series of actions, he refused to disclose the real terms of his agreements, he misleads investors (including Plaintiffs) about the Company.  In doing these things, he managed to steal Sellers' Choice, artificially inflate the stock of Jerrick to get an uplist, and then use the proposed uplist to lure more investors (including Plaintiffs).  If it sounds like a Ponzi scheme, it is because, at bottom, it was.  And this is the basis of the claims of securities fraud.

3.      Plaintiffs now bring this action alleging securities fraud, breach of contract, breach of fiduciary duty, securities fraud, conversion, and unjust enrichment, and seek, among other things, the recovery of actual, compensatory, consequential, punitive and treble damages, along with their costs, including reasonable attorneys 'fees.

## PARTIES

4.      Plaintiff Home Revolution, LLC ("Home Revolution") is a Limited Liability

Company, organized under the laws of the state of Delaware, with a principal place of business located at 777 South Street, Newburgh, New York 12550.

5.      Plaintiff Evan Sohn ("Sohn") is an individual with a place of residence located at 117 E Hudson Avenue, Englewood NJ 07631

6.      Plaintiff Jay Goldberg ("Goldberg") is an individual, with a place of residence located at 260 Arch Road, Englewood, NJ 07631.

7.      Defendant Jerrick Media Holdings, Inc. ("Jerrick") is a Nevada Corporation, registered to conduct business in New Jersey, with a principal place of business located at 2050 Center Avenue, #640, Fort Lee, New Jersey 07024.

8.      Defendant Jeremy Frommer ("Frommer) is an individual, with a place of residence located at 2030 Hudson Street, Fort Lee, NJ 07024.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and, with respect to certain claims, 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over the Defendants insofar as they reside in and/or conduct business in this State and in this district. Moreover, all of the transactions occurred in this District and the causes of action arose herein.

11.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(l) and (2) because all Defendants reside in this District and a substantial part of the events giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

12.     Prior to March 3, 2019,  Seller's Choice was a wholly owned division of Plaintiff Home Revolution, a digital "marketing solution" provider dedicated to the interests, growth, and

profitability of e-commerce brands.  Plaintiffs Sohn and Goldberg were the sole members of Home Revolution.

13.      Plaintiffs dedicated a significant amount of money, time, resources, and good-will growing and developing Seller's Choice into a valuable and successful business.

14.      Defendant Jerrick is also in the "technology solutions" industry, primarily through its on-line content publishing arm - - Vocal Media.  Defendant Frommer is the Founder, Chief Executive Officer, and principal shareholder of Jerrick.

15.      In late 2018, Frommer and Jerrick approached the Plaintiffs to discuss the possibility of acquiring Seller's Choice.

16.      In or about March 2019, Frommer sent Plaintiffs what purported to be a binding letter of intent from Jerrick to acquire Seller's Choice, with an employment agreement for Goldberg.  The proposal was rejected by Plaintiffs.

17.      On or about May 9, 2019, Frommer sent Plaintiffs a revised term sheet valuing Sellers Choice at $2 million and offering to acquire 14% of the Seller's Choice asset from Home Revolution immediately, and the balance to be acquired by September 15, 2019.  The offer contemplated consideration of $1 million in cash and $1 million in Jerrick stock, with the stock to be valued on a Volume Weighted Average Price ("VWAP")  formula tied to the public stock price from the execution date of the initial Term Sheet to the Closing Date of acquisition.

18.      At the time, Frommer represented to Plaintiffs that Jerrick expected its stock "up-list" to a national stock exchange to occur in September 2019.  Plaintiffs insisted that the entire cash portion of the price be paid in full at closing.

19.      On August 29, 2019, Frommer informed Plaintiffs that that the "deal was off."

20.      Thereafter, the parties continued to negotiate the acquisition.

21.     In or about September 2019, the parties agreed to sell to Jerrick 100% of Seller's Choice in exchange for $1 million in stock (with the stock to be valued on a Volume Weighted Average Price ("VWAP")  formula tied to the public stock price from the execution date of the initial Term Sheet to the Closing Date of acquisition) plus $1 million in cash which would be paid as follows:  (1) $340,000 at closing and, (2) the balance as a promissory note and Security Agreement (the "Agreement").

22.     Pursuant to the Agreement, the Plaintiffs 'shares were to be registered in their names by no later than December 31, 2019.

23.     The promissory note was to be securitized by the collateral of Seller's Choice's assets, along with Jerrick's assets, and a promissory note signed and backed by Jerrick (the "Note"). Included in the Agreement was a specific clause that no assets (especially Seller's Choice) were to be diluted, tampered with, and/or absorbed into Jerrick's operation until the loan and interest were paid in full.  This was a critical inducement by Defendants to convince Plaintiffs to sell the business.

24.     As a further inducement and to address concerns about Defendants 'financial ability and ultimate willingness or ability to pay the outstanding cash that would be due, Defendants committed to paying 9.5% interest on the note for the first 6 months. To induce an extension of an additional 6-month option, Frommer offered to escalate the interest by 5% points each month thereafter (Frommer represented his policy was to pay off notes prior to 6 months) up to a final 12-month final maturity date.  Frommer repeatedly represented to Plaintiffs that there would be no need for the 6-month extension as Jerrick would either: (1) already be up-listed and the loan paid in full or (2) convince one of Frommer's investors to loan funds at a lower rate to pay off the Plaintiffs 'note.

5

25.     Plaintiffs would never have entered into the transaction but for Frommer's promises and representations that: (1) the up-list would occur in or about late 2019, (2) the promissory note would be paid in 6-months  - - or, at most, 12-months with the escalated interest penalty, (3) their shares would be registered on or before December 31, 2019, and (4) Seller's Choice would in no way be altered or absorbed into Jerrick's operations until the debt was fully paid.

26.     On or about December 27, 2019,  Goldberg communicated with Frommer to confirm the December 31, 2019 registrations.  Plaintiffs were shocked to learn that Defendants had no intention of registering their shares by the contractually-required date.

27.      Like any good Ponzi Scheme, Defendants immediately began to build a tower of promises to offset their fraud.  First, Defendants offered a 50% interest penalty for all interest payments due.  The Plaintiffs reluctantly accepted a $50,000 principal payment and a 40% interest penalty.  Having bought some time, but with no intention to abide by his agreements, Frommer never sent the paperwork to reflect the agreement.  Instead, Defendants unilaterally changed the agreement and set the interest and penalty payments on a monthly basis and made no principal payment, as agreed to.

28.     On or about February 12, 2020, the Plaintiffs again contacted Frommer, who directed them to Jerrick's investment banking advisor, in order to finally get their shares registered along with a UCC filing to further secure the note.   It was just another delay tactic.

29.     On March 4, 2020, Plaintiffs contacted Jerrick's investment advisor to advise that the Defendants remained in breach of the Agreement by failing to register their shares.

30.     On March 31, 2020, Plaintiffs received a series of emails from Jerrick reflecting the agreed-upon escalated interest, plus the 40% penalty.

31.      By the end of April 2020, the Defendants still had not: (1) up-listed, (2) registered

Plaintiffs 'shares, (3) paid the note, or (4) paid the accelerated interest. Indeed, by then, Jerrick had completely altered and absorbed Seller's Choice into Jerrick's operations - - effectively precluding any unwinding or extraction and profitability (in breach of the Agreement) - - and altogether stopped making payments on the note (in breach of the Agreement).

32.     On April 28, 2020, Plaintiffs received an email from Jerrick's counsel, claiming that Defendants were seeking to reduce the monthly interest to 6.5% and eliminate all penalties. In effect, Defendants were now seeking to remove the very provisions that induced Plaintiffs to enter into the agreement and sell Seller's Choice.

33.     Defendants 'counsel implied that Plaintiffs were charging egregious interest and penalties.  In fact, those provisions were proposed by Jerrick as inducement for a 6-month extension of the note as outlined in the executed Agreements.  The provisions were also consideration for Jerrick's default on the mandatory registration date.

34.     It was, of course, a brilliant scheme:  induce Plaintiffs into selling the company with promises that were knowingly false, induce forbearance of their defaults with more promises and agreements, and then have your lawyer decry those agreements as improper!  Use the revenues of Seller's Choice for Year end 2019 on the Defendants books reflecting in excess of 90% of total Jerrick revenues, which Jerrick needed to present to investors and regulatory agencies for up-list consideration. And, use the same approach with carryover revenue from successful Seller's Choice revenue for 2020 Q1 financials for Jerrick's continued compliance for up-list

35.     On or about May 4, 2020, Plaintiffs reviewed Jerrick's Form-10K filing, which asserted that the Plaintiffs' Note,  disclosed in the 10, K reflected a 9.5% interest rate for 12 months and not the increased interest that is defined in the promissory note. This was a completely misleading – and therefore fraudulent - misrepresentation of the parties 'Agreements, in which a

key term was the escalating interest rate.

36.     With no options, and Frommer's belief that he had Plaintiffs between a rock and a hard place (which, in fact, he did), on or about May 5, 2020, the Plaintiffs agreed "without prejudice," to a new payment schedule which reduced the immediate cash requirements for Jerrick, differing the bulk of the interest and penalties for 90 days and an obligation to register Plaintiffs ' shares within 10 days.  However, Defendants continued to refuse to pay off the loan principal, or even set a date-certain to do so.

37.     As of April  2020, Defendants have ceased, reduced, or delayed making interest payments on the Note, neither at the original interest rate, or the contractual penalty rate.

38.     To date, Defendants have breached the parties 'agreement by: (1) failing to pay the principal of the note, in the amount of $660,000, (2) failing to pay interest on the Note, (3)  failing to register Plaintiffs 'shares, (4) failing to up-list, and (5) tampering with and absorbing Seller's Choice and its assets into Jerrick, thereby precluding any ability to extract, separate, or value its assets, and by extension, Plaintiffs'  investment.

39.     Defendants also committed common-law fraud, fraud in the inducement, and securities fraud, as set forth below.

40.     The "Uplist" Inducement - Inducement by the Defendants to sell their company to Defendants for, in part, common stock of Defendant Jerrick.  In effect, the Defendants were "selling" stock to the Plaintiffs, and Plaintiffs only agreed thereto based on specific and detailed representations, promises, and statements by Defendant Frommer.  By way of example, Frommer made multiple representations from  April of 2020 through closing that that the stock would be up-listed to NASDAQ Capital Markets.  It has not been.  And it was a material and significant inducement by Plaintiffs to invest.  It was and remains a falsehood.  Think of it this way:  had

Frommer explained to Plaintiffs and the public that the ONLY basis for uplisting was the acquisition of Plaintiffs' asset (which he never paid for) and that without it Jerrick would never survive, Plaintiffs would never have invested.  It was a fraud tied to the sale of stock to Plaintiffs (and others).

41.     "Under cover of Uplist" - For more than 5 quarters Frommer has been verbalizing and  flashing in presentations the prospect of the Uplist to Plaintiffs, shareholders, product vendors, service provider to offset their payables with equity. The hook was never on the merits.  The prospects of revenue growth were dependent on Jerrick's absurdly expensive platform/product, but Frommer falsely represented that the company was being run like a "hedge-fund" that will grow through acquisitions. In reality, none of this was true at the time the representations were made, with revenues and revenue-growth remained virtually nonexistent.  The Plaintiffs contend that when Frommer finally acquired Sellers' Choice through his false representations – Jerrick's first - - and only - - acquisition of an operating revenue-generating entity, it finally gave Frommer the narrative that he was seeking to pretend that the company and its product and the bottomless pit of lost millions was somehow "real."  In reality Frommer never intended to pay for the company but rather to steal it with his own idea of what he thought he should pay for it after signing on the dotted line. Frommer later bragged to Goldberg and Sohn and his own team about how the only thing that was "real" about deals is what he decided was "real" about deals. Regardless of what was signed. That the only thing that mattered was the "narrative" in the moment that it was needed. That is all merely a clever way of admitting that Frommer was deceiving the Plaintiffs and the Public.

42.     It is also critical to note that the Plaintiffs are not merely "sellers."  They are investors and shareholders.  Thus, as outlined herein, Frommer's public deception, false

statements, and fraud go beyond simply the transactions between the parties.  They go to the heart of Plaintiffs' investments and constitute securities fraud.

43.     Frommer convinced the Plaintiffs to invest and to sell their valuable asset based on his promise that their shares would be registered by December 31, 2019.  In failing to do so, Frommer did not merely breach his agreements, he committed fraud and his admission that "the only real thing in a deal is what [he] decides is real," merely proves that he never planned on registering their shares.  Again, it is classic securities fraud.

44.     Stock Price and Volume Manipulation - Frommer has admitted directly to Plaintiff Goldberg verbally and through texts that he wanted to control who and how large shareholders could sell their positions even pushing recently to place Home Revolution shares in a group for organized post "uplist" selling programs.

45.     Admission of Purposeful avoidance of share registration.  Frommer indicated in recent weeks in texts to Plaintiff Goldberg and on several occasions since the acquisition date (September 11, 2019) that he would place Home Revolution shares in a program for easing out and selling those shares in an organized manner which strongly indicates that he had no intention of ever registering Home Revolution shares in December or prior to his decision point out of concern that Home Revolution would weigh down the stock as Jerrick was pursuing upward momentum in its share price toward an Uplist. These texts and discussions have made clear Frommer's fear about Home Revolution having the stock publicly tradeable as a barrier to his control over stock price momentum.  This points to - - among other things - stock manipulation.

46.     False Fabrication of penalties and offsets - - Frommer and Jerrick fabricated a penalty for their share registration default to Home Revolution then removed it at their will.

47.     Repeated Breach of fiduciary through selective non-disclosure of material

information  to the shareholders and the public - None of these stock registration terms from the acquisition agreements have ever been publicly disclosed in Jerrick filings nor in Frommer articles or Shareholder presentations. Frommer and Jerrick have carefully and selectively only disclosed those aspects of the acquisition that favored what they needed to make the case to shareholders, the SEC, and the press for a higher market valuation based on the incremental revenues that they booked as a result of their very public statements about the positive aspects resulting from the acquisition of Seller's Choice.  Again, this is textbook securities fraud.

48.     Intentionally hiding material disclosures from shareholders and the public. These current proceedings have not been communicated as a filing to the shareholders or in any external communications.

49.     False, conflicting, and misleading statements by Frommer about the interest schedule relating to the Home Revolution Securitized Note Payable - - Frommer in his own communications and through Jerrick filings and communications through PR companies (dressed up as analysts) has communicated false interest schedule information to shareholders and the public.

50.     Defendants have never offered to remedy the defaults of the terms relating to Plaintiffs' stock registration or Ledger Removal request or  to un-restrict Home Revolution stock in Jerrick Media Holdings, Inc stock by December 31, 2019, and have repeatedly ignored requests to remedy the breaches and defaults.

51.     Frommer is persistently engaged in self-dealing practices in order to support (and conceal) his Frommer's absurd compensation package. Specifically, while refusing to pay debts, creditors, and investors, Frommer pays himself an absurdly high salary/compensation.

52.     In Defendants' recent submission to this Court, they brazenly lied about offering

an alternative mechanism that would have the shares registered with the priority given and agreed to in the counter-signed acquisition agreement terms.

53.     Plaintiffs, therefore, bring this action to force Defendants to cure their fraud, meet their contractual obligations, repay their debt, and reimburse Plaintiffs for the significant damages caused by Defendants 'misconduct.

**FIRST  COUNT**

**(Violation of New Jersey Uniform Securities Law, N.J.S.A. 49:3-47, et seq.)**

54.     Plaintiffs repeat and reallege the foregoing allegations as if set forth more fully at length herein.

55.     Defendants, by virtue of their acts and omissions, as set forth above, have violated and breached their duties under the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47, et seq.

56.     Specifically, Defendants are in violation of and have breached their duties under the New Jersey Uniform Securities Law, N.J.S.A. 49:3-52, by among other things, (i) defrauding Plaintiffs, (ii) making untrue statements of material fact, and (iii) omitting statements of material fact.

57.     Additionally, Defendants are in violation of and have breached their duties under the New Jersey Uniform Securities Law, N.J.S.A 49:3-52.1, by among other things, (i) refusing to register Plaintiffs 'stock, (ii) filing and distributing false disclosure statements, (iii) employing deceptive and fraudulent devices, schemes and artifices to manipulate the value of Plaintiffs ' investment.

58.     Further, Defendants are in violation of and have breached their duties under the New Jersey Uniform Securities Law, N.J.S.A. 49:3-53, by among other things, (i) employing devices, schemes and artifices to defraud Plaintiffs, (ii) perpetrating a fraud and deceit upon

Plaintiffs (iii) engaging in dishonest and unethical behavior, and (iv) making untrue statements of material fact and omitting statements of material fact.

59.     Moreover, Defendants are in violation of and have breached their duties under the New Jersey Uniform Securities Law, N.J.S.A. 49:3-71, by among other things, their above described acts and omissions.

## SECOND COUNT

**(Fraud in the Sale of Securities in Violation of Section 10(b) of the**
**Securities and Exchange Act of 1934, 15 U.S.C.A. Sec. 78j(b) and S.E.C. Rule 10b-5)**

60.     Plaintiffs repeat and reallege the foregoing allegations as if set forth more fully at length herein.

61.     Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C.A. Sec. 78j(b) and S.E.C. Rule 10b-5), prohibits the use of manipulative or deceptive practices in the offer and sale of securities.

62.     The investments that Defendants agreed to register  to Plaintiffs and based upon which Plaintiffs entered into the agreements with Defendants are securities under applicable Federal law.

63.     Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the relevant period, did: (i) in their 10K disclosures, deceive the investing public and Plaintiffs, as alleged herein; (ii) cause Plaintiffs to enter into the agreements described above, (iii)  failed to pay the principal of the note, in the amount of $660,000, (iv) failed to pay interest on the Note, (v)  failed to register Plaintiffs 'shares, (vi) failing to up-list, and (vii) absorbing Sellers 'Choice into Jerrick, thereby destroying its value, and by extension, Plaintiffs 'investment.

64.     The Defendants took actions set forth herein. These defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or

omitted to state material facts necessary to make the statements not misleading; and (iii) engaged

in acts, practices, and a course of business which operate as a fraud and deceit upon the Plaintiff

in violation of Section 10(b) of the Exchange Act and Rule 10(b)-5.

65.     In addition to the duties of full disclosure imposed on Defendants as a result of their

making affirmative statements and reports, or participating in the making of affirmative statements

and reports, or participating in the making of affirmative statements and reports to the Plaintiffs

and the public, they each had a duty to promptly disseminate truthful information that would be

material to investors in compliance with the integrated disclosure provisions of the SEC as

embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. §229.10 et seq.)

and other SEC regulations, so that the market prices of those companies would be based on truthful,

complete and accurate information.

66.     The Defendants, individually and in concert, directly and indirectly, by the use,

means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in

a continuous course of conduct to conceal adverse material information about the business,

business practices, sales performance, product marketing and promotion, operations and future

prospects of Defendants as specified herein.

67.     By virtue of the foregoing, the Defendants have each violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

68.     Defendants, through their above-described acts and omissions, violated Section

10(b) of the Securities and Exchange Act of 1934.

69.     As a result of Defendants' actions and omissions, Plaintiff has been and continues

to be severely damaged.

**THIRD COUNT**
**(Equitable Accounting)**

14

70.     Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

71.     The oral and written contracts between Plaintiffs and Defendants involve extensive and complicated accounts and transactions.

72.     Plaintiffs have made various requests for information regarding the Defendants' activities with regard to these transactions, all of which have been refused.

73.     To date, Defendants have refused or have been unable to account for any of the transactions, up-lists, repayment, and/or Plaintiffs loans and investments and have refused to demonstrate why they are not complying with their agreements.

74.     There is no remedy at law that would resolve this issue as fully, adequately, or expeditiously as an accounting.

## FOURTH COUNT
## (Fraud)

75.     Plaintiff repeats and re-alleges the foregoing allegations as if more fully set forth at length herein.

76.     As set forth in detail above, and incorporated into this Count by reference, Defendants made fraudulent misrepresentations and/or omissions of material fact.

77.     Defendants knew or should have known that their statements were false when made.

78.     Defendants intended to deceive Plaintiff with the misrepresentations and omissions and induce Plaintiffs to act to their detriment by continuing with the sale of their profitable and successful business and to forebear on their rights upon disclosure of the substantial fraud committed by Defendants.

15

79.     Plaintiffs had no knowledge of the falsity of the Defendants' representations and omissions and reasonably relied on the Defendants' misrepresentations to their detriment.

80.     As a result of Defendants' fraud and misrepresentation, Plaintiffs have been damaged in an amount to be determined at trial but in no event less than $5 million.

## FIFTH COUNT
### (Breach of Fiduciary Duty)

81.     Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

82.     During the course of their business dealings, Plaintiffs reposed confidence in Frommer to abide by their agreements, and to safely guard their investments and Frommer accepted this trust.  Frommer agreed to protect and administer Plaintiffs 'money, stock, and investments.

83.     As a result, Defendant Frommer had a fiduciary relationship pursuant to which Frommer owed Plaintiffs a fiduciary duty.

84.     Pursuant to that fiduciary duty, Frommer also had a duty of loyalty, and was required to refrain from self-dealing and from taking unfair advantage. He was also required to disclose all material facts and act in Plaintiffs 'best interest.

85.     Instead, Frommer exploited Plaintiffs 'trust by defrauding them.

86.     Accordingly, Frommer breached his fiduciary duty causing the Plaintiffs to suffer damages.

## SIXTH COUNT
### (Conversion)

87.     Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

88.     Defendants acquired Plaintiffs 'company based on false statement, false promises, and false representations.

89.     Defendants wrongfully exercised dominion and control over Sellers 'Choice.

90.     Despite repeated requests, Defendants have refused to abide by the very conditions agreed-to in order to acquire the Company.  Therefore, the Defendants have improperly converted Sellers 'Choice for their own use causing damage to Plaintiffs.

## SEVENTH COUNT
## (Unjust Enrichment)

91.     Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

92.     Plaintiffs transferred Sellers 'Choice to Defendants and thus conferred a benefit upon them.  The transfer of ownership of Sellers 'Choice was in consideration of the payment of $1 million in cash and $1 million in Jerrick Stock.

93.     Although Plaintiffs transferred ownership of Sellers 'Choice to Defendants, the Defendants neither paid the purchase price, not registered Plaintiffs 'stock.

94.     Under the circumstances, it would be inequitable for Defendants to continue to retain the value of Sellers; 'Choice, or the resulting debt.

## EIGHTH COUNT
## (Breach of Contract)

95.     Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

96.     The Agreements set forth above are enforceable contracts between Plaintiffs and Defendants.

97.     To date, Defendants have breached the parties 'agreement by: (1) failing to pay the

principal of the note, in the amount of $660,000, (2) failing to pay interest on the Note, (3) failing

to register Plaintiffs 'shares, (4) failing to up-list, and (5) absorbing Sellers 'Choice into Jerrick,

thereby destroying its value, and by extension, Plaintiffs 'investment.

98.     These actions constitute material and significant breaches by the Defendants of the

parties 'Agreements.

99.     The material breaches of Contract by the Defendants have caused and shall

continue to cause, substantial and irreparable damage to the Plaintiffs and their investments, in an

amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Home Revolution, LLC, Evan Sohn, and Jay Goldberg, respectfully

requests that this Court issue the following relief with respect to the Defendants:

    a. Declare that the Agreements and promissory note have been breached;

    b. An award of compensatory damages, punitive damages and attorney's fees and costs; and

    c. Such additional and further relief as the Court may deem just and equitable.

LAW OFFICE OF N. ARI WEISBROT LLC

By: _____

N. Ari Weisbrot, Esq.

1099 Allessandrini Avenue
New Milford, New Jersey 07646
(201) 788.6146
aweisbrot@weisbrotlaw.com
*Attorneys for Plaintiffs*

Dated: August 14, 2020